**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **EBONY B.,** [1] <br><br>          Plaintiff, <br><br> v. <br><br> **MARTIN O'MALLEY,** <br> **Commissioner of Social Security,** [2] <br><br>          Defendant. | Civil Action No. 21-cv-1742-MAU |

**MEMORANDUM OPINION**

Plaintiff Ebony B. ("Plaintiff") seeks Supplemental Security Income ("SSI") Benefits under the Social Security Act ("the Act").  ECF No. 12–1 at 1.[3]  The Social Security Administration ("SSA" or "Commissioner") entered a final decision denying Plaintiff's claim on April 26, 2021.  Administrative Record ("AR") at 2–7, 16.  On appeal to this Court, Plaintiff seeks reversal or, alternatively, remand for reconsideration under 42 U.S.C. § 405(g).  ECF No. 12.

---

[1]       Plaintiff's name has been partially redacted according to the Committee on Court Administration and Case Management of the Judicial Conference of the United States's recommendation.  *See* Memorandum from Hon. Wm. Terrell Hodges, Chair, Comm. on Ct. Admin. & Case Mgmt. to Chief Judges of the U.S. Cts. of Appeals, Chief Judges of the U.S. Cts., Clerks of the U.S. Cts. of Appeals, and Clerks of the U.S. Dist. Cts. (May 1, 2018), *available at* https://www.uscourts.gov/sites/default/files/18-ap-c-suggestion_cacm_0.pdf   (last visited Aug. 22, 2024).

[2]       Pursuant to Federal Rule of Civil Procedure 25(d), the current Defendant's name is substituted for his predecessor.  *See* Fed. R. Civ. P. 25(d).

[3]       Relevant docket entries are: (1) the AR (ECF No. 7 and its attachments); (2) Plaintiff's Motion for Judgment of Reversal (ECF No. 12); (3) Defendant's Opposition to Plaintiff's Motion for Judgment of Reversal and Motion for Judgment of Affirmance (ECF Nos. 14, 15); and (4) Plaintiff's Opposition to Defendant's Motion for Judgment of Affirmance and Reply in support of Motion for Judgment of Reversal (ECF Nos. 17, 18). Citations are to the page numbers in the ECF headers.

Upon review of the Administrative Record, the Parties' briefs, the relevant law, and for the reasons set forth below, the Court **GRANTS** Plaintiff's motion (ECF No. 12) and **DENIES** Defendant's motion (ECF No. 14).

## BACKGROUND

### The Social Security Act

Congress enacted the Act to support individuals unable to work for reasons including disability. *See e.g.*, *Smith v. Berryhill*, 139 S. Ct. 1765, 1771–72 (2019). To qualify for SSI benefits under the Act, a claimant must show she is "disabled." 42 U.S.C. § 1382(a)(1). A person is "disabled" when she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).

The SSA, through an Administrative Law Judge ("ALJ"), uses a five-step test to evaluate whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). First, the ALJ must determine whether the claimant is currently engaged in "substantial gainful activity." *Id.* Second, the ALJ considers whether the claimant has a "severe medically determinable physical or mental impairment" or "combination of impairments." *Id.* Third, the ALJ decides whether the claimant's impairment(s) is among those disabilities in a regulatory listing that conclusively establishes disability. *Id.* If the impairment conclusively establishes disability at step three, that is the end of the analysis. *Id.* If not, a claimant may still be disabled depending on the outcome of the final two steps. *Id.* Fourth, if disability was not established at step three, the ALJ assesses a claimant's Residual Functional Capacity ("RFC") and past relevant work. *Id.* Fifth, the ALJ considers whether the claimant can perform other work in the national economy considering her age,

education, work experience, and RFC. *Id.*; *see also Butler v. Barnhart*, 353 F.3d 992, 997 (D.C. Cir. 2004).

The RFC is "what an individual can still do despite his or her limitations." S.S.R. 96–8p, 1996 WL 374184, at *2. It is an assessment "of the extent to which an individual's medically determinable impairment(s), including any related symptoms . . . may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical or mental activities." *Id.* The RFC reflects an individual's "*maximum* remaining ability to do sustained work activities." *Id.* The claimant bears the burden of proof at the first four steps of the evaluation. *Butler*, 353 F.3d at 997. At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform specific jobs available in the national economy. *Id.* The ALJ may ask a vocational expert ("VE") to testify as to whether the claimant can perform other work due to her RFC. *See Callahan v. Astrue*, 786 F. Supp. 2d 87, 90 (D.D.C. 2011).

## Plaintiff's Disability Claims and Procedural History

Plaintiff was born on January 20, 1983. AR at 215. At the time of the ALJ's decision, she was thirty-seven years old. ECF No. 12–1 at 2. She has a high school education, some college education, and no additional vocational training. AR at 53. Her past work experience includes jobs as an office manager, quality insurance inspector, security guard, and in government services. AR at 83. On April 17, 2018, Plaintiff applied for Disability Insurance Benefits ("DIB") and SSI pursuant to Titles II and XVI of the Act. AR at 16. She alleged that she became disabled on April 1, 2017. ECF No. 12–1 at 1. Her impairments include endometriosis, sciatica, depression, anxiety,

and hypertension.  *Id.*[4]  Defendant denied both claims initially and upon reconsideration.  AR at 16.  On January 28, 2020, Plaintiff filed a written request for an administrative hearing.  *Id.*

### The Administrative Hearing

On June 25, 2020, ALJ Raghav Kotval held a telephonic hearing for Plaintiff's case.  AR at 16, 49.  The ALJ heard testimony from Plaintiff as well as a VE, Edith Edwards ("Edwards"). *Id.*  During the hearing, Plaintiff amended her alleged disability onset date to January 1, 2020.  AR at 17.  After answering questions about her past work experience, Plaintiff testified about her symptoms and conditions.  AR at 63–80.  First, Plaintiff testified that she went to a doctor in January 2019 because of severe pain in her pelvic and lower back area.  AR at 65.  At the time, her doctor advised her to see a specialist, who attributed her back pain to a disc on her spine.  AR at 65–66.  Plaintiff testified that she began seeing a chiropractor but stopped going a few months later due to the COVID-19 pandemic.  AR at 66.  Plaintiff also testified that her back pain often made it difficult for her to reach and lift on her right-hand side and to sit for long periods of time. AR at 68–69.

In addition to her back pain, Plaintiff also testified that she had constant pelvic pain due to endometriosis.  AR at 65, 69.  Plaintiff testified that when her endometriosis flared up, which happened about every two years, it felt like "pins and needles just throbbing . . . down there."  AR at 70.  On top of bleeding heavily, Plaintiff testified that her endometriosis made her feel weak and as though she was unable to do anything for herself.  *Id.*  For example, Plaintiff testified that bathing herself was challenging.  *Id.*  Even when she was not having a flare up, Plaintiff testified

---

[4]     Plaintiff underwent emergency surgery in 2012 due to a burst appendix.  AR at 71.  During this surgery, Plaintiff's right tube and ovary were removed.  *Id.*  Between her surgery in 2012 and another major surgery in 2016, scar tissue accumulated.  *Id.*

that she often had to lay down for approximately half the day.  AR at 71.  Plaintiff also testified

that she was unable to sit for more than 25 to 30 minutes at a time without her legs getting numb

and feeling cramps in her lower body or stand for more than 20 to 25 minutes without feeling

intense pressure.  AR at 71–72.  Plaintiff testified that she takes Gabapentin, Flexeril, and Aleve.

AR at 66.  When asked whether she suffered any side effects from the medications, she testified

that she was often constipated and drowsy.  AR at 72–73.  In addition to medication for her physical

symptoms, Plaintiff also testified that she had been prescribed medication from her psychiatrist.

AR at 74.  Plaintiff testified that this medication helped her "get through the day so [she] won't be

semi-depressed."  AR at 74.

Plaintiff also testified about the impact of her symptoms on her day-to-day life.  AR at 75–

81.  For example, Plaintiff testified that she cannot be around more than 15 to 20 people at a time.

AR at 75.  Even though Plaintiff struggled to bathe herself, she testified that she could usually take

her time getting in the shower and do so without assistance.  AR at 75.  If the pain was severe,

however, Plaintiff testified that she needed help getting in and out of the tub.  *Id.*  She testified that

she could cook for herself, but that she would only go to the grocery store with her cousin because

she could not lift certain things.  *Id.*  In addition to her cousin's help with grocery shopping, he

would help her do laundry, and her sister would come over weekly to help her clean.  AR at 75–

76.  Plaintiff also testified that, prior to the pandemic, she would go to restaurants with her family,

but that she could only sit in booths.  AR at 76.  If the restaurant only had hard chairs, she would

not go because the hard seating would hurt her.  *Id.*

Finally, the ALJ asked Plaintiff about her substance use.  AR at 78.  Plaintiff testified that

she used to use marijuana to help manage her chronic pain.  *Id.*  She testified that she stopped

smoking marijuana around February 2020 when she began using CBD oil[5] instead to manage her chronic pain.  *Id.*  When the ALJ asked how often she smoked marijuana previously, Plaintiff testified "maybe twice, three times a day."  *Id.*  She also testified, however, that she did not smoke marijuana while she was working.  AR at 79 ("I didn't consume going to work.  It would probably be on a weekend, but I didn't mess around going to work.").

The ALJ asked Plaintiff whether she "noticed any difference since [she] stopped smoking marijuana."  AR. at 77–78.  Plaintiff responded that the marijuana acted faster than the CBD oil, but that the CBD oil soothed her pain, so she would rather use the CBD oil.  AR at 78.  The ALJ asked whether marijuana made Plaintiff "sleepy or drowsy," to which Plaintiff answered that it made her "relaxed."  *Id.*  The ALJ asked if Plaintiff "[found] it harder to focus with the marijuana, like when [she'd] been smoking it?"  *Id.*  Plaintiff responded "no."  *Id.*  The ALJ asked if Plaintiff had "any effects of marijuana" and "[w]hat were the effects that [she] noticed with marijuana?"  *Id.*  Plaintiff responded that she "didn't have any effects."  *Id.*

The ALJ asked Plaintiff whether she would have been "less effective on the job if [she] had used marijuana?"  *Id.* at 80.  Plaintiff responded that anyone would be less effective on the job if they were smoking marijuana.  *See id.*  The ALJ again asked Plaintiff whether the reason she did not smoke marijuana while working was because she "wouldn't have been able to focus as much or concentrate as much."  *Id.*  Plaintiff answered "[n]o" and that she "just kn[e]w that you're not supposed to consume at work . . . being in security."  *Id.*

---

[5]      Cannabidiol ("CBD") is an ingredient in marijuana derived from the hemp plant that "does not cause a high by itself."  Peter Grinspoon, MD, *Cannabidiol (CBD): What we Know and What we Don't*, HARV. HEALTH PUBLISHING, HARV. MED. SCHOOL (Apr. 4, 2024) https://www.health.harvard.edu/blog/cannabidiol-cbd-what-we-know-and-what-we-dont-2018082414476 (last visited Sept. 10, 2024).

Next, the ALJ heard testimony from VE Edwards.  AR at 81–88.  Edwards classified Plaintiff's past jobs as office manager (DOT 169.167–034; sedentary; skilled; SVP 7), quality insurance inspector for government services (DOT 168.287–014; light; skilled; SVP 7), and security guard (DOT 372.667–034; light; semiskilled; SVP 3).  AR at 82–83.  The ALJ then asked Edwards a series of hypothetical questions about an individual with the Plaintiff's age, education, and past work experience, based on the RFC the ALJ had formulated for Plaintiff.  AR at 84–85.  Specifically, the ALJ questioned Edwards about a hypothetical individual with the following limitations:

> [The] individual is limited to a light exertional level; lift, carry, push, pull 20 pounds occasionally, 10 pounds frequently; can sit for 6 hours in an 8-hour workday, stand and walk for 6 hours.  This individual can only frequently climb ramps and stairs, balance, kneel and crouch; . . . can only occasionally stoop and crawl, and can never climb ropes, ladders, scaffolds.  This individual can only occasionally be exposed to unprotected heights and moving, mechanical parts.  This individual is limited to simple, routine tasks.  This individual can only occasionally interact with supervisors, coworkers, and the public; can only occasionally adjust to changes in workplace settings.  Finally, this individual is limited to applying commonsense understanding to carry out uninvolved written or oral instructions and is limited to dealing with problems involving a few concrete variables in or from standardized situations.

*Id.*

Edwards testified that the hypothetical individual could not perform past relevant work with these limitations.  AR at 86.  Edwards testified that this individual could, however, perform the jobs of checker at the light level (DOT 222.687–010; light; unskilled; SVP 2; 30,000 nationally), a paper pattern inspector (DOT 649.687–018; light; unskilled; SVP 2; 47,000 nationally), and a housekeeping cleaner (DOT 323.687–014; light; unskilled; SVP 2; 93,000 nationally).  *Id.*  When the ALJ asked what is the "tolerance for being off task," Edwards responded:

> Off task for these unskilled examples, such as this, less – it would be my opinion, as the DOT does not address it.  Less than 10% of the time should be fine; should be allowed.  At 10%, it's borderline.  It may or may not work, depending on the specific employer.  Anything more than 10% off task, no work for unskilled work.

AR at 87.

Finally, the ALJ asked Edwards to consider the same hypothetical individual with the same limitations, but this time limited to a sedentary exertional profile.  *Id.*  Edwards testified that there were several jobs as sorters and examiners at a sedentary level for this hypothetical individual (*e.g.*, DOT 734.687–042; sedentary; unskilled; SVP 2; 55,000 nationally), as well as jobs as an inserter (*e.g.*, DOT 713.687–026; sedentary; unskilled; SVP 2; 35,000 nationally), or as an addressing clerk (DOT 209.587–010; sedentary; unskilled; SVP 2; 16,000 nationally).  *Id.*  After Edwards' testimony, the ALJ closed the hearing and the record.  AR at 89.  The ALJ did not ask Edwards specifically about off-task limitations for an individual limited to a sedentary exertional profile.  *Id.*

### The ALJ's Decision

On August 12, 2020, the ALJ issued a decision denying Plaintiff's claims.  AR at 13.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2020.  AR at 19.  At step two, the ALJ found that Plaintiff had the following severe impairments: spine disorders, endometriosis, anxiety, affective disorder, trauma-related disorders, learning disorder, and substance abuse.[6]  *Id.*  At step three, the ALJ found that Plaintiff did not have an

---

[6]     Nowhere in the ALJ's decision does he make a specific finding that Plaintiff suffers from Substance Use Disorder ("SUD").  AR at 14–39.  Nor does the ALJ cite to any medical opinions in the record that support such a conclusion.  *Id.*  Rather, the ALJ remarks on Plaintiff's substance *use* and then, at other points in his analysis, presumes that she suffers from *SUD*.  *Id.* at 26 ("However, with evidence of substance use, the claimant had greater limitations in the ability to concentrate, persist, or maintain pace.") (citing no authority); *id.* at 27 ("Although she did not

impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 4040, Subpart P, Appendix 1.  AR at 20.  At steps four and five, the ALJ considered the prior administrative medical findings and medical opinions—including those of Dr. Elizabeth Nolte ("Dr. Nolte") from March 2019 and Drs. Lisa Venkataraman and Walter Y.K. Goo, the State agency physicians who evaluated Plaintiff's claims on behalf of the Commissioner—to formulate Plaintiff's RFC and determine whether she could perform past relevant work.  AR at 23–27.

The ALJ found that Plaintiff had the RFC to perform light work with the following exertional limitations:

> [Plaintiff] can occasionally lift, carry, push, and pull twenty pounds; frequently lift, carry, push, and pull ten pounds; sit for six hours in an eight-hour workday; stand and walk for six hours in an eight hour workday; frequently climb ramps and stairs, balance, kneel, and crouch; occasionally stoop and crawl; never climb ropes, ladders, or scaffolds; have occasional exposure to moving mechanical parts and unprotected heights; be limited to simple, routine tasks; occasionally interact with supervisors, coworkers, and the public; occasionally adjust to changes in workplace settings; apply commonsense understanding to carry out uninvolved written or oral instructions; be limited to dealing with problems involving a few concrete variables in or from standardized situations; *and be off task by over ten percent of the workday.*

AR at 22–23 (emphasis added).  At step five, the ALJ considered Plaintiff's age, education, work experience, and RFC to determine Plaintiff was unable to perform any past relevant work.  AR at 27–28.  The ALJ also concluded that no jobs existed in significant numbers in the national economy that Plaintiff could have performed.  *Id.*  Therefore, the ALJ determined that Plaintiff was disabled.  *Id.*

---

specify what aspects of the assessment were affected by substance abuse, Dr. Nathan reported the claimant could not manage her funds due to substance use.") (citing Ex. 11F, p.7).

The ALJ then addressed whether Plaintiff's substance use was a contributing factor material to the determination of disability, pursuant to sections 223(d)(2) and 1614(a)(3)(j) of the Act. AR at 17, 28–37. The ALJ found that, if Plaintiff stopped the substance use, she would have the RFC to perform light work with the following limitations:

> [Plaintiff] can occasionally lift, carry, push, and pull twenty pounds; frequently lift, carry, push, and pull ten pounds; sit for six hours in an eight-hour workday; stand and walk for six hours in an eight hour workday; frequently climb ramps and stairs, balance, kneel, and crouch; occasionally stoop and crawl; never climb ropes, ladders, or scaffolds; have occasional exposure to moving mechanical parts and unprotected heights; be limited to simple, routine tasks; occasionally interact with supervisors, coworkers, and the public; occasionally adjust to changes in workplace settings; apply commonsense understanding to carry out uninvolved written or oral instructions; be limited to dealing with problems involving a few concrete variables in or from standardized situations.

AR at 31–32. This RFC has the same limitations as the RFC that was the basis for the ALJ's initial disability determination except the ALJ excluded the limitation that Plaintiff would "be off task by over ten percent of the workday."

This updated RFC did not change the ALJ's conclusion that Plaintiff could not perform her past relevant work. The ALJ concluded, however, that if Plaintiff stopped the substance use, there were sufficient jobs in the national economy that Plaintiff could perform. AR at 36–37. As a result, the ALJ ultimately found that Plaintiff was not disabled because her SUD[7] was a contributing factor to the determination of Plaintiff's disability. AR at 37. On this basis, Defendant denied Plaintiff's claim.

After exhausting her administrative remedies, Plaintiff moves this Court to reverse the final administrative decision or, alternatively, for this Court to remand this case to the SSA for a new

---

[7]     From this point on, the Court will primarily use SUD to refer to what the ALJ interchangeably calls her substance use disorder, substance use, or substance abuse. The Court uses a more specific term when helpful for the analysis or for emphasis.

hearing pursuant to 42 U.S.C. § 405(g).  ECF No. 12.  The SSA asks this Court to affirm the ALJ's

determination.  ECF No. 14.

## LEGAL STANDARD

### I.    Scope of the Court's Review

A claimant who is denied benefits may seek district court review of a Commissioner's final

decision.  42 U.S.C. § 405(g).  The reviewing court must affirm the Commissioner's decision if it

is based on substantial evidence in the record and the correct application of the relevant legal

standards.  *Id.*; *Butler*, 353 F.3d at 999; *Smith v. Bowen*, 826 F.2d 1120, 1121 (D.C. Cir. 1987).

"Substantial evidence is 'more than a mere scintilla,' and means only 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 587 U.S.

97 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial

evidence is a "low bar."  *La. Pub. Serv. Comm'n v. Fed. Energy Regul. Comm'n*, 20 F.4th 1, 7

(D.C. Cir. 2021).  This standard "requires considerable deference to the decision rendered by the

ALJ."  *Crosson v. Shalala*, 907 F. Supp. 1, 3 (D.D.C. 1995).

Still, a reviewing court must "carefully scrutinize the entire record to ensure that the

Commissioner, through the ALJ, has both analyzed all of the evidence available and has

sufficiently explained his/her reasoning and the weights given to the facts."  *Pinkney v. Astrue*,

675 F. Supp. 2d 9, 14 (D.D.C. 2009).  The ALJ's decision must include "a statement of . . . findings

and conclusions, and the reasons or the basis therefor, on all material issues of fact, law, or

discretion presented on the record."  5 U.S.C. § 557(c).  "Importantly, an ALJ cannot merely

disregard evidence which does not support his conclusion."  *Hartline v. Astrue*, 605 F. Supp. 2d

194, 203 (D.D.C. 2009) (citing *Dionne v. Heckler*, 585 F. Supp. 1055, 1060 (D. Me. 1984)).  The

plaintiff "bears the burden of demonstrating that the Commissioner's decision [is] not based on

substantial evidence or that incorrect legal standards were applied." *Settles v. Colvin*, 121 F. Supp. 3d 163, 169 (D.D.C. 2015) (quoting *Muldrow v. Astrue*, No. 11–1385, 2012 WL 2877697, at *6 (D.D.C. July 11, 2012)); *Lane-Rauth v. Barnhart*, 437 F. Supp. 2d 63, 64 (D.D.C. 2006).

Relevant evidence in the record includes medical records and source opinions, as well as the individual's subjective complaints about her condition.   20 C.F.R. § 416.945.   When considering medical opinions, the ALJ must consider the supportability of each piece of evidence and consistency of the medical opinions across the record as a whole.   20 C.F.R. §§ 404.1520c, 416.920c; *see Nancy W. v. Kijakazi*, Case No. 20-cv-2505, 2023 WL 4846769, at *8 (D.D.C. July 28, 2023); *Shea M. v. Kijakazi*, Case No. 21-cv-02204, 2023 WL 3040602, at *10 (D.D.C. Apr. 21, 2023) (detailing changes in regulations governing how ALJs are to consider medical evidence for claims before and after March 27, 2017).

## II.   Functional Analysis

A "function-by-function" analysis requires a "'narrative discussion' identifying the evidence that supports each conclusion." *Butler*, 353 F.3d at 1000 (quoting SSR 96–8p, 1996 WL 374184, at *3, *7).   Courts in this Circuit use varying approaches to carry out a function-by-function analysis under SSR 96–8p, 1996 WL 374184 (July 2, 1996).[8]   Even if a court does not require "written articulation of all seven strength commands," the ALJ must still provide a "thorough narrative discussion of Plaintiff's limitations" and build a "logical bridge" between the

---

[8]      Other opinions have discussed these various approaches.   SSR 96–8p, 1996 WL 374184 (July 2, 1996).   *See Contreras v. Comm'r of Soc. Sec.*, 239 F. Supp. 3d 203, 207 (D.D.C. 2017) (comparing *Johnson v. Astrue*, No. 11-788, 2012 WL 3292416 (D.D.C. Aug. 12, 2012) and *Banks v. Astrue*, 537 F. Supp. 2d 75, 75 (D.D.C. 2008), with *Lane-Rauth*, 437 F. Supp. 2d at 63); *Charles v. Astrue*, 854 F. Supp. 2d 22, 29–30 (D.D.C. 2012).

evidence and his conclusions.  *Contreras*, 239 F. Supp. 3d at 207 (quoting *Banks*, 537 F. Supp. 2d at 85); *see also Butler*, 353 F.3d at 1000; *Lane-Rauth*, 437 F. Supp. 2d at 67.

An ALJ need not "encompass the entirety of his analysis in any particular paragraph of his decision," as long as he "provide[s] a sufficient basis for this Court to understand his reasoning when viewing the decision as a whole."  *Colter v. Kijakazi*, Case No. 20-cv-0632, 2022 WL 715218, at *11 (D.D.C. Mar. 10, 2022).  The ALJ must perform a functional analysis for both physical and mental abilities.  20 C.F.R. § 404.1545(b)–(c) (2021).  Limitations in mental abilities, like physical abilities, may also "reduce [a person's] ability to do past work and other work."  *Id.* § 404.1545(c).

### III.    Drug Addiction or Alcoholism

If a claimant is found to have a disability and there is medical evidence of Drug Addiction or Alcoholism ("DAA"), the ALJ must determine whether the DAA is a "contributing factor material to the determination of disability."  20 C.F.R. §§ 404.1535, 416.935.  There is a six-step evaluation process for an ALJ to assess if DAA is material to a disability determination.  SSR 13-2P, 78 Fed. Reg. at 11,941.  The initial step is an inquiry into whether the claimant has DAA.  *Id.* A finding of DAA must be based on medical evidence.  *Id.*  In the drug addiction context, the ALJ must identify record evidence from an acceptable medical source that establishes a person has a SUD.  *Id.*  If medical evidence does not establish DAA, there can be no DAA materiality that would defeat a disability determination.  *Id.*

Importantly, evidence that merely shows the claimant uses drugs or alcohol is insufficient to establish the existence of a SUD.  *Id.*  Self-reported drug or alcohol use cannot by itself support a finding of DAA.  SSR 13-2p, 78 Fed. Reg. at 11,944; *see also Smith v. Sullivan*, 733 F. Supp. 450, 453 (D.D.C. 1990) (noting "an alcoholic's own statements regarding his disease . . . could not

be the *sole* basis for the Secretary's finding of no disability" (emphasis in original) (citing *Ferguson v. Schweiker*, 641 F.2d 243, 249 (5th Cir. 1981)); *Fulwood v. Heckler*, 594 F. Supp. 540, 545–46 (D.D.C. 1984) (remanding ALJ decision because a person's own statements regarding his alcoholism cannot be the sole basis of a finding of no disability).  Although self-reported use may suggest the claimant has DAA, the ALJ may only make that determination by citing objective medical evidence from an acceptable medical source, and the evidence must also establish a maladaptive pattern of substance abuse.  SSR 13-2P, 78 Fed. Reg. at 11,944; *see also Foster v. Colvin*, 134 F. Supp. 3d 286, 209, 293 (D.D.C. 2015) (establishing DAA by relying on treatment notes from two doctors recommending substance abuse treatment); *Deskins v. Kijakazi*, Case No. 22-cv-1114, 2023 WL 3721470, at *2 (D.D.C. May 30, 2023), *appeal dismissed sub nom. Deskins v. O'Malley*, Case No. 23-cv-5223, 2024 WL 1342949 (D.C. Cir. Feb. 15, 2024) (relying on the claimant's hospitalization while using illicit substances and a doctor's diagnosis of alcohol abuse disorder); *Carroll v. Saul*, Case No. 19-cv-00391, 2020 WL 4754680, at *11 (D.D.C. Jan. 9, 2020), *report and recommendation adopted*, Case No. 19-cv-391, 2020 WL 4750238 (D.D.C. Aug. 17, 2020) (relying on a psychological evaluation, medical summary report, intake assessment, and a doctor's evaluation that references Plaintiff's marijuana and PCP abuse).  If there is no objective medical evidence of the claimant's SUD, it is reversible error for an ALJ to continue with the DAA materiality inquiry.  *See* SSR 13-2P, 78 Fed. Reg. at 11,941 (requiring "medical evidence from an acceptable medical source establishing that a claimant has" a SUD); *id.* at 11,944 ("Self-reported drug or alcohol use" is an "example[] of evidence that by itself does not establish DAA.").

When there is "medical evidence" of a claimant's DAA, the "key factor" for the ALJ to determine is whether the ALJ "would still find [the claimant] disabled if [she] stopped using drugs or alcohol."  20 C.F.R. § 416.935(b)(1).  In making such a determination, the ALJ must "evaluate

which of [her] current physical and mental limitations, upon which [they] based [their] current disability determination, would remain if [she] stopped using drugs or alcohol and then determine whether any or all of [her] remaining limitations would be disabling." *Id.* § 416.935(b)(2).  A single statement that DAA is material to a claimant's disability is insufficient.  SSR 13-2P, 78 Fed. Reg. at 11,946.  If the ALJ determines that the claimant's remaining limitations would not be disabling, DAA is a "contributing factor material to the determination of disability."  20 U.S.C. § 416.935(b)(3).[9]  If the remaining limitations are disabling, DAA is not a contributing factor.  *Id.* § 416.935(b)(4).  "All adjudicators must provide sufficient information in their determination or decision that explains the rationale supporting their determination of the materiality of DAA so that a subsequent reviewer considering all of the evidence in the case record is able to understand the basis for the materiality finding and the determination of whether the claimant is disabled."  SSR 13-2P, 78 Fed. Reg. at 11,941.

## DISCUSSION

Plaintiff argues that the ALJ erred in the formulation of Plaintiff's RFC and his analysis of her subjective complaints.  ECF No. 12-1.  Defendant maintains that the ALJ committed no errors and that deference to the Agency requires the Court to affirm.  ECF No. 14.  The Court agrees with Plaintiff that the ALJ erred in four ways in formulating her RFC, and, therefore, remands to the Agency for reconsideration.  The ALJ also appears to have erred in his initial DAA determination, as discussed below.  Because the Parties do not brief this matter, however, the Court does not remand on this basis.  In light of the Court remanding due to error in the ALJ's formulation of the

---

[9]      Additional steps that the Commissioner has set forth for the DAA materiality analysis are "5. Does the DAA cause or affect the claimant's medically determinable impairments?" and "6. Would the other impairment(s) improve to the point of nondisability in the absence of DAA?" SSR 13-2P, 78 Fed. Reg. at 11,941.

RFC, the Court need not reach Plaintiff's arguments regarding the ALJ's analysis of her subjective complaints.  That said, the Agency is free to reconsider Plaintiff's subjective complaints on remand, if necessary, in light of its reconsideration and evaluation of other evidence.

## I.      The ALJ's Initial DAA Determination.

Before turning to issues regarding the RFC formulation, the Court first expresses strong doubt that the ALJ made a proper SUD determination, which is a precursor to finding that someone should be denied disability benefits under a DAA analysis.[10]  As explained above, the ALJ first found that Plaintiff was disabled, but then attributed some impairment(s) to her alleged SUD and found that, because that alleged SUD was a contributing factor material to the determination of disability, she was ultimately not disabled.  For the ALJ to even reach the question of whether Plaintiff's substance use could preclude a finding of disability, however, the DAA regulations required the ALJ to first determine that Plaintiff actually suffered from substance use *disorder*.

Nowhere does the ALJ explain the evidence on which he relied to make such a finding. The ALJ does not appear to cite any medical opinion or evidence to make a SUD determination; instead, he predominately relies on Plaintiff's self-reported substance use—testimony that he often mischaracterizes.  AR at 14–39; *see also supra* Part II.A.[11]  This is clear error under the regulations. SSR 13-2p, 78 Fed. Reg. at 11,941.  The ALJ should not have proceeded to analyze whether Plaintiff should ultimately be deprived of disability benefits due to substance use before first following the regulations and making a proper finding that she suffered from such a disorder as to

---

[10]     The Court refers to the analysis that the ALJ is required to conduct as the "DAA analysis" and the DAA regulations' requirement that as part of that analysis, he make a proper finding of SUD, as an "SUD determination."

[11]     For example, the ALJ cites two medical reports that, according to the ALJ, indicate "the claimant reported alcohol and cannabis use."  AR at 25 (citing Ex. 20F, p.25 and 63; Ex. 23F, p.9). These reports do not reflect SUD.  *Id.*

trigger the remainder of the DAA analysis.  *Id.*; *Smith*, 733 F. Supp. at 453; *Fulwood*, 594 F. Supp. at 545.

As noted above, the ALJ's handling of this issue would otherwise be reversible.  Plaintiff has not raised this issue, however, and Defendant has not had the opportunity to respond. Accordingly, the Court in its reviewing capacity does not base its decision on this apparent error. Nonetheless, the Court remarks on this point for two reasons.  First, the ALJ's apparently insufficient SUD determination contributes to his later errors when deciding Plaintiff is not disabled due to her SUD.  *Infra* Part I.B.  These errors include citing sources in the record that do not support the ALJ's findings or conclusions.  *Id.*  Second, because the Court remands this case to the Agency for reconsideration, the Court emphasizes that the Agency must conduct a proper DAA analysis as the regulations require.  This includes making the initial determination of SUD, if warranted, based on sufficient evidence.

**II.     The RFC Assessment Lacks Substantial Evidence.**

Plaintiff argues that the ALJ erred in formulating her RFC in a number of ways.  ECF 12-1 at 14.  Specifically, Plaintiff claims that the ALJ failed to: (1) make a proper DAA materiality determination, including by identifying the evidence on which he relied to determine that she would be off task more than 10 percent of the workday with SUD, but would not be off task at all during the workday absent SUD; (2) address opinions that she had moderate limitations in her ability to understand, remember, and carry out detailed instructions; (3) include any limitation on concentration, persistence, or pace in her RFC despite finding opinions about such limitations credible; and (4) properly evaluate Dr. Nolte's opinion or address MRI evidence of her lumbar spine condition.  *Id.* at 4–15.

Defendant counters that the ALJ properly formulated Plaintiff's RFC and that substantial evidence supports the ALJ's decision.  ECF 14 at 10.  Defendant asserts that the ALJ considered all relevant evidence, the ALJ is not required to do a function-by-function analysis, and that a narrative discussion is sufficient to explain the ALJ's RFC determination.  *Id.* at 12–15.

### A.  The ALJ Failed to Explain Plaintiff's Limitations Absent DAA.

Putting aside the ALJ's apparent failure to make a proper SUD determination, the Court will consider Plaintiff's arguments for how the ALJ otherwise erred in assessing her RFC.

Plaintiff asserts that the ALJ failed to explain adequately how Plaintiff's impairments would improve or remain considering her SUD, especially the complete omission of the more than 10% off task limitation from her initial RFC in her final RFC.  ECF No. 12-1 at 7–9, ECF No. 17 at 2 (claiming that the ALJ "failed to explain . . . the evidence upon which he relied to support his determination that the Plaintiff would be off task more than 10 percent of the workday with substance abuse, but would not be off task [at] all absent substance abuse").  According to Plaintiff, this error was significant because it is the only difference in her RFC with and without SUD and appears to have led the ALJ to ultimately determine, albeit not expressly, that Plaintiff was not disabled.

Defendant asserts—in two paragraphs and without citing any authority—that the ALJ properly considered Plaintiff's abilities absent SUD and committed no errors.  ECF No. 14 at 13 (claiming that Plaintiff has not shown "any additional work-related limitations were warranted than already set forth in the ALJ's *comprehensive and detailed RFC*." (emphasis added)).  Defendant does not discuss what the ALJ was required to do for his DAA analysis or proffer how the ALJ satisfied these requirements.  Instead, Defendant merely points to two state agency psychologists who "found that Plaintiff could pay attention for two hours at a time sufficient to

perform unskilled work throughout a normal work week (Tr. 34, 105, 108)" and remarks that Plaintiff "was able to perform substantial gainful activity until January 2020 even with substance abuse (Tr. 17, 62, 77)." *Id.* Defendant is wrong.

The ALJ did not make or adequately explain how Plaintiff's DAA caused or affected certain impairments and how her other impairments would "improve to the point of nondisability in the absence of DAA" such that DAA was a "contributing factor material to the determination of disability." AR at 29–38; SSR 13-2P, 78 Fed. Reg. at 11,941.

Although substance use does not preclude a claimant from receiving SSI or DIB, a claimant "shall not be considered to be disabled . . . if [DAA] would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). According to SSR 13-2p.; Titles II and CVI: Evaluating Cases Involving Drug Addiction and Alcoholism (DAA), "[t]he key factor . . . in determining whether [DAA] is a contributing factor material to the determination of disability is whether we would still find a claimant disabled if he or she stopped using drugs or alcohol." SSR 13-2P, 78 Fed. Reg. at 11,941. In essence, to affirm an ALJ's decision to deny benefits, the Court must find that substantial evidence supports a finding that "the claimant would not meet [the Act's] definition of disability if [they] were not using drugs or alcohol." *Id.* As the ALJ acknowledged, he must "evaluate the extent to which the claimant's mental and physical limitations would remain if the claimant stopped the substance use" to determine whether her SUD was a "contributing factor material to the determination of disability." AR at 19. Despite recognizing his obligation, the ALJ failed to meet it. AR at 16–38.

The ALJ erred, and Defendant's arguments otherwise fail, for four reasons. First, the ALJ does not make express findings about what limitations, if any, would no longer exist absent Plaintiff's SUD. AR at 32–37. The Court is left to infer two points: (1) that the ALJ determined

19

Plaintiff's limitation of being off task more than 10% of a workday would no longer exist without her SUD; and (2) this is the only limitation that is attributable to SUD.  *Id.*  Nowhere does the ALJ make this conclusion clear, despite the Act's requirements that he do so.   20 C.F.R. § 416.935(b)(2); *see also* SSR 13-2P, 78 Fed. Reg. at 11,941.

Second, if this indeed was the ALJ's conclusion, it is not supported by substantial evidence. The ALJ impermissibly cherry-picks reports from 2019 (allegedly during times of SUD) and 2020 (non-SUD) to assert that Plaintiff had various limitations on concentration or memory when she was using substances, but not without.  For example, the ALJ claims that Plaintiff "reported poor concentration and frustration" when she was using substances.  AR at 28 (citing Ex. 20F, p. 19; Ex. 26F, p. 14).  The ALJ does not specify what aspects of the medical evaluations he relies on to make such a conclusion.  Moreover, reviewing the record citations does not reflect any clear support for the ALJ's conclusions.  For example, the report at Ex. 20F is from December 11, 2019, while Plaintiff was using substances.  Part of the report indicated that Plaintiff's behavior is "[c]ooperative"; her orientation is "[f]ully [o]riented"; *her attention span and concentration is "[f]air"*; her recent memory is "[f]air"; her remote memory is "[f]air"; *her thought process is "[l]ogical/[c]oherent"*; and her thought content is "[a]ppropriate."  *Id.* (emphasis added).  The report does not attribute any of these markers to SUD.  Further, reports from April 27, 2020; March 30, 2020; February 25, 2020; and January 14, 2020—*after* Plaintiff reportedly stopped using substances—reflect identical assessments of her behavior; orientation; attention span and concentration; memory; thought process; and thought content.  ECF No. 7, Ex. 20F at 1–18.

Nor does the ALJ clearly state which aspects of the reports he relies on to make the broad conclusion that Plaintiff's mental impairments improved when she stopped using substances:

The claimant testified that she stopped the use of marijuana in early 2020. (Hearing Testimony). The evidence of record during this time reflects the claimant had improvement in mental impairment symptoms with treatment. (Ex. 19F, p.1). She denied side effects of medication and did not endorse irritability, low moods, or worry. (Ex. 20F, p.1). The claimant had evidence of fair attention span and concentration. (Ex. 20F, p.2, 6, 10, and 15). However, the claimant continued to receive treatment for physical and mental impairments. (Ex. 19F; Ex. 20F; Ex. 26F; Ex. 27F; Ex. 28F).

AR at 29.  As noted, the indicators for Plaintiff's "fair attention span and concentration" were the same in medical opinions or evaluations before and after 2020, when Plaintiff allegedly stopped using marijuana.  By failing to reconcile this evidence in the record and generally attributing vague, asserted differences in Plaintiff's mental capacity with SUD, the ALJ fails to ground his conclusion on substantial evidence.

Further, the ALJ at times mischaracterizes Plaintiff's testimony.  He stated that Plaintiff "testified that marijuana would make her less effective and more likely to make a mistake. (Hearing Testimony)." AR at 22.  This is misleading.  AR at 79–80.  Plaintiff's relevant testimony was in the context of her testimony that she did not smoke marijuana while she was working.  *Id.*  The ALJ asked her, hypothetically, if she "would've been less effective on the job if she had used marijuana," to which she answered "[y]es, anyone would be less effective." AR. at 80.  This is different than Plaintiff testifying that *she* was less effective in her prior work because she had smoked marijuana at work, which Plaintiff expressly testified she did not do.  AR at 79.[12] Similarly, when the ALJ asked Plaintiff why she did not smoke marijuana at work, Plaintiff

---

[12]     Further adding to the confusion is the fact that the ALJ does not discredit or express any doubt regarding Plaintiff's testimony about not smoking marijuana while she was working.  At other points, the ALJ states that he finds some of Plaintiff's testimony about the intensity of her subjective complaints unpersuasive.  This, however, does not touch on Plaintiff's testimony about her past substance use.  Given this, it is difficult to discern the logical connection the ALJ was attempting to make between Plaintiff's marijuana use and the ultimate RFC conclusion.

responded that she "was a security guard. [She] had to be attentive with the kids and people's IDs. [She] couldn't make a mistake. [She] didn't want to lose [her] job." AR at 80. The ALJ then asked Plaintiff to speculate whether "[she'd] have been more likely to make a mistake if [she] had been smoking marijuana on the job," to which Plaintiff answered yes. *Id.* (Plaintiff further clarifying that this was not because she "wouldn't have been able to focus as much or concentrate as much," as the ALJ asked it, but because she was "not supposed to consume at work.").

Third, the ALJ does not explain how, even if Plaintiff would be off task less often at work without SUD, she would not have any off-task limitations at all. *Id.* The Court is again left to merely assume that the ALJ determined Plaintiff would not be off task at all but for her substance use. This is significant; VE Edwards testified that if Plaintiff were off task 10% of the time for the relevant light work jobs, it would be "borderline. It may or may not work, depending on the specific employer." AR at 87. Therefore, whether the ALJ concluded Plaintiff would be off task 10% of the time instead of less than 10% of the time would likely impact his ultimate conclusion of non-disability. Not only did the ALJ fail to explain whether Plaintiff would be off task at all, he also failed to explain how he evaluated medical opinions and on what metrics he relied to make his vague conclusions. In the absence of such explanations, the ALJ failed to build a logical bridge between the evidence he considered and conclusions he reached.

Fourth, the two pieces of information upon which Defendant relies to assert that the ALJ satisfied his obligations are irrelevant and unpersuasive. The state agency psychologists' opinions that Plaintiff could "pay attention for two hours at a time to complete a normal workday" clearly do not address whether Plaintiff would be off task for 10% or more in a workday. The ALJ does not link the psychologists' opinions to any such finding. Defendant's attempt to do so now is not only unpersuasive, it is an impermissible *post hoc* justification. AR at 34. Further, these opinions

are from 2019 and, according to the ALJ's own determination, would have been during the time Plaintiff was using substances. This cannot, therefore, support a conclusion about Plaintiff's ability to remain on task *absent* SUD. On the contrary, it undermines the ALJ's conclusion that Plaintiff's ability to focus or be off task was linked to any SUD.

Defendant also argues that the ALJ referenced how Plaintiff performed "substantial gainful activity until January 2020 even with substance use." ECF No. 14 at 13. Again, this in no way explains how the ALJ decided that limitations to Plaintiff's RFC included being off task for 10% or more of a workday with substance use but presumably not at all without it. Moreover, it undermines the ALJ's conclusion. The ALJ found that, due to her impairments, with or without substance use, Plaintiff can no longer perform her prior work. That Plaintiff previously worked *during a time when she smoked marijuana* is not evidence about how much she would be off task with or without SUD when the ALJ already found she could not do her prior work.

Because the ALJ failed to explain how Plaintiff's SUD impacts her mental limitations and RFC determination, and failed to reconcile evidence in the record, he deprives the Court of its ability to carry out its albeit limited assigned review function. *See Contreras*, 239 F. Supp. 3d at 209–10 (quoting *Brown v. Bowen*, 794 F.2d 703, 708 (D.C. Cir. 1986)) (alteration in original) ("As this Circuit has established, '[t]he judiciary can scarcely perform its assigned review function, limited though it is, without some indication not only of what evidence was credited, but also whether other evidence was rejected rather than simply ignored.'"). The harm of this error is clear. If not for the ALJ's supposed determination that Plaintiff would have no limit on her ability to stay on task without SUD, she would remain disabled based on the ALJ's prior RFC formulation.

### B.  The ALJ Failed to Explain his Determination of Plaintiff's Reasoning Level

The errors in the ALJ's determination of Plaintiff's RFC with and without SUD are on their own sufficient to remand this case to the Agency.  To the extent it may be helpful to the Agency on remand, the Court will now address Plaintiff's other arguments regarding the ALJ's RFC formulation.  *Charles*, 854 F. Supp. 2d at 29.

Plaintiff argues that the ALJ erred by failing to explain how he concluded Plaintiff could perform work at Reasoning Level 2.  ECF No. 12-1 at 7–9; ECF No. 17 at 2–3.  Reasoning Level 2 is defined in the Dictionary of Occupational Titles Appendix C as being able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations."  ECF No. 12-1 at 7, n.1.  According to Plaintiff, the ALJ failed to explain how he made such a conclusion even though he credited as "highly persuasive" state agency physician opinions that Plaintiff would have "moderate difficulties understanding, remembering, and carrying out detailed instructions." *Id.* at 7.  Plaintiff asserts that the ALJ erred by not reconciling these opinions with his conclusion that she could perform work at Reasoning Level 2.  *Id.* at 7–9.

Defendant's only response is that Plaintiff previously worked at various reasoning levels. Specifically, Defendant responds that, just prior to the Administrative Hearing, while still using marijuana, Plaintiff worked as a security guard.  ECF No. 15 at 11–12.  Defendant cites how the Vocational Expert testified such work was "semi-skilled."  *Id.* at 12 (citing AR at 83). Additionally, Defendant asserts that such work "[m]ore significantly" requires a reasoning level of 3.  *Id.* (citing AR at 269, 501).

The Court agrees with Plaintiff that the ALJ, again, did not rely on substantial evidence to reach his conclusion about Plaintiff's reasoning level. The ALJ may well have determined that other evidence led to such a conclusion, but his key error was failing to explain how the evidence that would cut against such a conclusion—evidence which he found credible—should be disregarded or is outweighed by other evidence. The ALJ's decision does not reconcile the state psychologist opinions with his conclusion that Plaintiff could perform work at a Reasoning Level 2. *See, e.g.*, AR at 36 (making general assertions such as "[r]egarding the [Plaintiff's] mental impairments, she reported improvement with medication."). After determining Plaintiff's RFC without substance use, the ALJ concluded that Plaintiff would not be able to perform the full range of "light work." AR at 37. Based on the VE's testimony about an individual with Plaintiff's RFC, without SUD, the ALJ concluded that Plaintiff could perform "light work" that was limited to a Reasoning Level 2. *Id.* This is the only part of the ALJ's opinion where he addressed his apparent conclusion that Plaintiff could perform jobs at a Reasoning Level 2. AR at 23–37.

Defendant's argument that the ALJ's decision was based on substantial evidence is again unpersuasive and constitutes a *post hoc* rationalization. AR at 23–37. The only time that the ALJ discusses Plaintiff's past work as a security guard is when he concludes that she is *unable* to do any of her past relevant work. AR at 28. The ALJ did not discuss what sort of reasoning level this former work required, or what, if anything, this might mean for Plaintiff's reasoning level now. *Id.* Moreover, this argument does not address Plaintiff's argument about contradictory and credible opinions from the state psychologists. The ALJ's error here is again harmful, as his finding with respect to Plaintiff's reasoning level was key to his determination that she could perform certain work in the national economy sufficient to render her ultimately not disabled. AR at 37.

### C.  The ALJ Failed to Adequately Address Limitations on Concentration and Pace

Plaintiff argues that, even though the ALJ found credible opinions that Plaintiff had "moderate limitations in concentration, persistence, or pace, absent substance use, (Tr. 31), he failed to include any limitations upon concentration, persistence, or pace in either his [RFC] or in his hypothetical question to the [VE]."  ECF No. 12-1 at 9.  According to Plaintiff, the ALJ failed to explain if or how such limitations were "adequately addressed by a limitation to the performance of simple, routine, tasks" which required Plaintiff to "occasionally adjust to changes in workplace settings, apply commonsense understanding to carry out uninvolved written or oral instructions, and be limited to dealing with problems involving a few concrete variables in or from standardized situations."  *Id.* at 10.

Without citing any authority, Defendant broadly asserts that the ALJ sufficiently accounted for any limits in Plaintiff's ability to concentrate, persist, or maintain pace.  ECF No. 15 at 13.  Again, Defendant's arguments are either unpersuasive or are merely *post hoc* rationalizations.  *Id.* at 12–13.

First, Defendant argues that the ALJ considered:  Plaintiff no longer using marijuana four or five months prior to the hearing; examinations showing Plaintiff had fair attention and concentration that improved with mental health treatment; and that Plaintiff "denied side effects of medication and did not endorse irritability, low moods, or worry."  ECF No. 15 at 12.  These pieces of evidence, however, do not address or contradict the opinions that Plaintiff had limitations in concentration, persistence, or pace.  AR at 35.

Second, Defendant merely claims that "[t]his [is] not a case where many of Plaintiff's mental status examinations indicated that she had difficulties in concentration."  ECF No. 15 at

12.  Defendant does not, however, cite any evidence the ALJ discussed or considered those examinations (or lack thereof) in his decision with respect to concentration persistence, or pace. In any event, this again does not address Plaintiff's argument that the ALJ found opinions that Plaintiff had moderate limitations on her concentration, persistence, or pace credible.  *Contreras*, 239 F. Supp. 3d at 207–210 (holding that the ALJ erred by failing to build a logical bridge between the evidence he considered and his conclusions; his "discussion of Plaintiff's mental limitation" fell "far short" of what was required; and that the ALJ pointed to no evidence that contradicted other evidence of mental limitations Plaintiff put forth).  This is another error in the ALJ's formulation of the RFC, as he failed to build a logical bridge to his conclusions or otherwise show that his decision on this issue was supported by substantial evidence.

### D.  The ALJ Failed to Adequately Address Limitations on Plaintiff's Ability to Sit or Squat

Regarding her physical impairments, Plaintiff contends that the ALJ also failed to properly evaluate pertinent evidence from Dr. Nolte.  ECF No. 12-1 at 13.  Specifically, Plaintiff asserts that an X-ray of Plaintiff's lumbar spine at the time of Dr. Nolte's evaluation showed that Plaintiff had "significant intervertebral disc degenerative changes at L5-S1 with mild retrolisthesis" and "mild interverbal disc degenerative change at L3-L4."  *Id.* (citing AR at 977).  Dr. Nolte subsequently opined that there was a moderate limitation on Plaintiff's ability to sit and squat, and a mild limitation in bending, and that Plaintiff should avoid prolonged sitting, heavy lifting, heavy carrying, and frequent bending.  *Id.* at 13–14.

Plaintiff argues that the ALJ found Dr. Nolte's opinion "highly persuasive," but failed to include or explain why he did not include any limitation in Plaintiff's RFC related to her ability to sit or squat, and instead found that she could sit for six hours in an eight-hour workday.  *Id.* at 14.

On a related point, Plaintiff argues that the ALJ failed to address how, if at all, pertinent evidence of an October 22, 2019, MRI that conflicted with his RFC formulation factored into his decision. *Id.*[13]

Defendant does not contest Plaintiff's argument that the ALJ found Dr. Nolte's examination "highly persuasive," but insists that the ALJ properly considered this opinion. ECF No. 14 at 13. Regarding limitations on Plaintiff's ability to squat, Defendant claims that "Dr. Nolte's moderate limitation in squatting was accounted for in the representative occupations identified by the vocational expert" because two of the three occupations "do not require <u>any</u> climbing, balancing, stooping, kneeling, crouching, or crawling <u>at all</u>." *Id.* (citing AR at 37). As for the limitations on Plaintiff's ability to sit, Defendant simply claims that "Dr. Nolte did not quantify Plaintiff's specific sitting limitation," and that two state agency physicians both found that Plaintiff had the "physical [RFC] to perform light work consistent with the ALJ's residual [RFC] assessment." *Id.* at 13–14 (citing AR at 102–03, 115, 154–57). Finally, Defendant asserts that, even if the ALJ should have considered restrictions on Plaintiff's ability to sit or squat, the "[VE] also identified representative sedentary occupations Plaintiff could perform (which accounted for her other limitations)." *Id.* at 14 (citing AR at 87–88). Therefore, according to Defendant, this would not have changed the result. *Id.*

Defendant's response again misses the mark. Defendant's argument that Plaintiff might still be able to perform some of the jobs the VE identified does not address whether or how the

---

[13]    Plaintiff claims that the MRI showed she had "a central disc protrusion and mild spondylosis at L5-S1, resulting in moderate to severe left foraminal stenosis with possible impingement of the existing left L5 nerve root, moderate right foraminal stenosis without evidence of nerve root impingement, and mild encroachment of the right lateral recess without definite impingement of the proximal right S1 nerve root." ECF No. 12-1 at 14 (citing AR at 1098).

ALJ addressed Dr. Nolte's opinion in formulating Plaintiff's RFC.  Nor does the Defendant point to any part of the ALJ's decision in which the ALJ explained how he reconciled Dr. Nolte's "highly persuasive" opinion with his RFC that included no limitations on Plaintiff's ability to sit or squat. ECF No. 14 at 13–14.  In this way, Defendant continues to rely on impermissible *post hoc* justifications for why the ALJ may have reached his conclusion.  *Id.*

This failure on the ALJ's part also constituted harmful error.  The ALJ's ultimate determination that Plaintiff was not disabled, after first determining that she was disabled (discussed above), depended on his consideration of the VE's testimony that a hypothetical person with Plaintiff's final RFC could perform work as a Checker 1 (light work, 30,000 national jobs); Paper pattern inspector (light work, 47,000 national jobs); and Housekeeping cleaner (light work, 93,000 national jobs).  AR at 37.  The ALJ found that someone with Plaintiff's final RFC "would be capable of making a successful adjustment to work that exists in significant numbers in the national economy" and Plaintiff was, therefore, not disabled.  *Id.*  There is no indication that the ALJ considered whether any of these jobs would be available to Plaintiff if she had any degree of limitation on her ability to sit.  Therefore, the ALJ's failure to address evidence he found credible about limitations on Plaintiff's ability to sit or squat again deprived this Court of its limited review function and renders his decision unsupported by substantial evidence.

### III.    Subjective Complaints

In the alternative, Plaintiff argues that the ALJ failed to properly evaluate her subjective complaints.  ECF 12-1 at 15–16.  Specifically, Plaintiff asserts that the ALJ "erroneously required the Plaintiff to prove the type and degree of her subjective complaints by objective medical evidence," which she had not done.  *Id.* at 15.  Plaintiff argues that the ALJ's approach was contrary

to Social Security Ruling 16-3p: Titles II and XVI: Evaluation of Symptoms in Disability Claims, and, therefore, erroneous as a matter of law. *Id.*

Because the Court remands for a new hearing on the ALJ's improper RFC formulation, the Court need not reach at this time Plaintiff's challenge to the ALJ's analysis of her subjective complaints. *See Saunders*, 6 F.4th at 5 (citing *Barry v. Astrue*, 622 F.3d 1228, 1234 n.3 (9th Cir. 2010)) ("Given our remand for a new hearing, we need not resolve [the other] claim[s].") (alterations in original). The Agency must consider Plaintiff's subjective complaints in light of its reconsideration of the record evidence when it reviews her case on remand. *Butler*, 353 F.3d at 1004.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's Motion for Reversal (ECF No. 12) is **GRANTED**, and Defendant's Motion for Affirmance (ECF No. 14) is **DENIED.** This case is hereby remanded to the Commissioner for further administrative proceedings consistent with this Opinion, pursuant to 42 U.S.C. § 405(g). The Court will issue a separate Order.

Date: September 10, 2024

_____
MOXILA A. UPADHYAYA
United States Magistrate Judge